**Shantell SWENSON, Plaintiff,**

v.

**LINCOLN COUNTY SCHOOL DISTRICT NO. 2, A Wyoming School District, Defendant.**

No. 02–CV–1062–B.

United States District Court, D. Wyoming.

May 3, 2003.

James R. Bell, Murane and Bostwick, Casper, WY, for Plaintiff.

Dennis W. Lancaster, Lancaster Law Offices, Afton, WY, for Defendant.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BRIMMER, District Judge.

In 1990, Congress found that some 43,-000,000 Americans have disabilities and that discrimination against disabled persons persists in several areas of society. 42 U.S.C. § 12101(a)(1), (3). This case arises out of one of those individual's experiences while attending school in west-central Wyoming. The matter is before the Court on Defendant's Motion for Summary Judgment. Upon reading the briefs, hearing oral argument, and being fully advised of the premises, the Court **FINDS** and **ORDERS** as follows:

### Statement of Parties and Jurisdiction

Plaintiff, Shantell Swenson, was a resident of Cokeville, Wyoming at all relevant times. Plaintiff graduated from Cokeville High School in May 2002 and now attends college in south-western Wyoming.

Defendant, Lincoln County School District No. 2 ("School District"), is a school district organized under Wyoming law. *See* Wyo. Stat. Ann. §§ 21–6–201 to 21–6–225 (2001). Under Wyoming law, a school district is a political subdivision of the state. *Carbon County Sch. Dist. No. 2 v. Wyo. State Hosp.*, 680 P.2d 773, 775 (Wyo. 1984). Defendant operates the Cokeville and Star Valley High Schools. Defendant receives federal financial aid to assist it with programs for disabled individuals. (Def.'s Answer, at ¶ 25).

 The Court exercises jurisdiction pursuant to 28 U.S.C. § 1331.[1] Venue is proper. 28 U.S.C. § 1391(b).

---

1. The Court notes that Defendant is not entitled to Eleventh Amendment immunity. Eleventh Amendment immunity calls into question the subject matter jurisdiction of the district court and must be considered in appropriate cases. *Thompson v. Colorado*, 278 F.3d 1020, 1024 (10th Cir.2001). Eleventh Amendment immunity extends to states and governmental entities that are arms of the state. *Duke v. Grady Mun. Schs.*, 127 F.3d 972, 974 (10th Cir.1997). The determination of the existence of Eleventh Amendment immunity is a question of federal law, which must be answered on the basis of the individual state laws involved. *Id.* at 975. Under Wyoming law, a school district is a political subdivision of the state and is more akin to a city or county than an arm of the state. *Stoddard v. Sch. Dist. No. 1, Lincoln County*, 590 F.2d 829, 835 (10th Cir.1979). Accordingly, a Wyoming school district is not entitled to Eleventh Amendment immunity.

## Background

Plaintiff was born with cerebral palsy and has been confined to a wheelchair most of her life. Cerebral palsy is a disability which is believed to be caused by damage to the brain before, during, or shortly after birth. Symptoms of cerebral palsy include the loss of voluntary muscular control and coordination.

In 1989, Plaintiff began kindergarten in Cokeville, Wyoming. The School District did not have a wheelchair, so Plaintiff began her educational career by being pulled around school "in a little red wagon." (Pl.'s Resp. to Def.'s Mot. for Summ. J. ("Pl's Resp."), Exh. A, Attach. a, at p. 3). When Plaintiff attended elementary school, the School District's buildings were not handicap accessible. (*Id.*, Exh. A, at ¶¶ 3–4). However, the School District had provided Plaintiff with a full-time aide, Dixie Roberts, to assist her from the time she arrived in the morning until she left school in the evening. (Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mem."), Exh. D (Roberts Aff.), at ¶ 5–6).[2]

Before Plaintiff began junior high, her parents and grandfather (the "Swensons") commenced a campaign to make the school facilities more handicap accessible. (*Id.*, Exh. F, at pp. 47–48). This campaign began with a walk-through of the school facilities where the Swensons made suggestions to school administrators about placing ramps, elevators, electronic door openers, and other equipment in the school. (*Id.*). It was during this walk-through that the Swensons first learned that the School District, particularly principal Larry Daniels, had a negative attitude towards Plaintiff's disability and making the schools handicap accessible.[3] (*Id.*, Exh. G, at p. 25; Exh. E, at pp. 90–91). Plaintiff's father described this walk-through as the beginning of a "long, hard struggle" with the School District. (*Id.*, Exh. F, at p. 47).

During the building walk-through, Plaintiff's parents informed Mr. Daniels that they would like the gymnasium, which did not have any handicap seating or lifts, to be more accessible. (*Id.*, Exh. G, at p. 25). Mr. Daniels informed the Swensons that he did not think the gymnasium had to be handicap accessible because he did not anticipate Plaintiff being able to use those facilities. (*Id.*). Mr. Daniels also outwardly manifested his feelings towards Plaintiff in subtler ways. For example, while explaining the fire escape routes to Plaintiff's junior high class, he told Plaintiff that in the event of a fire, she should be the last one out of the building behind all the other students and teachers. (*Id.*, Exh. E, at p. 91).

Life did not get any easier for Plaintiff after she began high school. At the beginning of Plaintiff's freshman year, the Swensons filed a complaint with the Department of Education's Office of Civil Rights ("OCR") after the School District had promised to resolve several accessibility issues at the Cokeville High School, but then failed to address any of those issues. (*Id.*, Exh. A, at ¶¶ 9–10 & Attach. a). After that OCR complaint was filed, the School District voluntarily filed a "Com-

---

**2.** The School District provided Plaintiff with a full-time aide from first through twelfth grade. Plaintiff's aide for all twelve years was Ms. Roberts. Plaintiff testified that she never had any complaints about Ms. Roberts' performance; however, there were certain things Ms. Roberts would not do, such as move chairs located in the handicapped seating area in the auditorium, or tell individuals to move out of the handicapped seating in the gymnasium. (Pl.'s Resp., Exh. A, at pp. 30, 74, 102).

**3.** Mr. Daniels was the principal of both the junior high and high school in Cokeville because of the small number of students enrolled in each school.

mitment to Resolve" the issues raised in the Swensons' complaint. (*Id.*, Exh. O (Dep.Exh. 56)). The School District followed through on its commitment and resolved all these accessibility issues. (*Id.*, Exh. A, at ¶ 11; Exh. F, at p. 48).

However, during Plaintiff's freshman year, the School District began building a new high school in Cokeville. (*Id.*, Exh. A, at ¶ 11). The new Cokeville High School was substantially completed by September 1999. (*Id.*). However, the School District had taken the money for signage, which included the handicap parking signs, out of the original building construction contract. (*Id.*, Exh. J, at p. 42). As a result, there were no permanent handicap parking signs to mark the location of handicap parking spaces in the parking lot. (*Id.*, Exh. A, at ¶ 11). Instead, in the "big rush to finish the high school," the School District used some makeshift signs to mark the handicap parking spots. (*Id.*, Exh. J, at p. 50). The School District's special services director knew these signs were not in the correct place and did not comply with the Americans with Disability Act Accessibility Guidelines. (*Id.*, Exh. I, at pp. 21–22, 27). The students moved into the new high school at the beginning of Plaintiff's sophomore year. (*Id.*, Exh. A, Attach. c, at p. 1).

Although the high school was new, Plaintiff and her parents experienced the same old difficulties. During the 1999–2000 school year, Plaintiff's parents had difficulty finding handicap parking when they brought her to extracurricular activities. (*Id.*, Exh. B, at ¶ 4).[4] This was because several parking spaces still did not have handicap parking signs, other than being painted on the cement. (*Id.*, Exh. B, at ¶ 4). During the winter months when snow covered the painted handicap signs,

those handicap spaces would routinely be occupied. (*Id.*). As a result, the Swensons would have to park farther away, sometimes across the street, which made it difficult and problematic to unload Plaintiff's wheelchair and push her through the snow to the high school. (*Id.*). On numerous occasions, the Swensons encountered the handicap parking spaces at the high school being used by non-handicapped persons, including school staff members. (*Id.*, Exh. B, at ¶ 4; Exh. E, at p. 109). After moving into the new high school, Plaintiff had difficulty accessing the auditorium during the school day and for extracurricular activities, such as band and theater. (*Id.*, Exh. E, at pp. 69–76, 92–94). The auditorium at the new high school had designated handicapped seating; however, because that seating was routinely filled with desks and chairs, there were times Plaintiff just had to stand or sit in the doorway of the auditorium to watch her classmates. (*Id.* at p. 71). Even when Plaintiff was able to access the handicap seating in the auditorium, she still encountered difficulty viewing the stage because school personnel would film plays and band concerts from the handicap seating area. (*Id.* at pp. 76, 92–94). Plaintiff asked the school administrators and staff operating the video equipment to address this problem "countless" times to no avail; in fact, one school staff member told Plaintiff he was filming for a purpose and that she could look around him to watch the performance. (*Id.* at pp. 76–77, 93–94).

Plaintiff encountered the same types of difficulties, such as having to stand or sit in the doorway and having to move chairs and desks out of the handicap seating area, in the new high school's gymnasium. (*Id.* at pp. 96–97, 100). Additionally, when Plaintiff participated in the pep club, which

---

4. At this time, Plaintiff was commuting to school on a bus specially outfitted to transport disabled individuals. (Pl.'s Resp., Exh. E, at pp. 33–35). The bus driver always made sure Plaintiff got into the school building in the morning before school started. (*Id.* at p. 35).

is a student organization that raised money by selling concessions at extracurricular activities, she was told that there was "no room for her" or relegated to sitting in one spot so she did not hinder other students while they sold concessions. (*Id.* at pp. 84–88).

As a result of these and other issues,[5] the Swensons filed a second complaint with the OCR in September 2000. (*Id.*, Exh. A, Attach. c; Exh. O (Dep.Exh. 26)). In turn, the School District drafted an "ADA Accessibility Action Plan" at the beginning of Plaintiff's junior year. (*Id.*, Exh. O (Dep. Exh. 12)). Apparently, on July 11, 2002, the OCR acknowledged that the School District had satisfactorily addressed the issues it agreed to resolve in its ADA Accessibility Action Plan.[6]

Notwithstanding the School District's recognition that it was violating the ADA, Plaintiff was still experiencing difficulty gaining access to the high school on a day-to-day basis. During Plaintiff's senior year, she began driving herself to school on her motorized wheelchair. (*Id.*, Exh. E, at p. 30). Also during that year, Ms. Roberts frequently missed school because of a personal situation, and when she was there, she did not arrive at school until the third period. (Pl.'s Resp., Exh. E, at pp. 28–29).

On countless occasions, Plaintiff would arrive at the high school in the morning before school started or during extracur-

ricular activities to find that the handicapped door opener at the high school was not working or the doors were locked. (*Id.* at pp. 27–28, 34–41). When confronted with these situations during the school day, Plaintiff could use an alternate route to gain access to the high school. (*Id.* at p. 28). However, when confronted with these situations while attending extracurricular activities, Plaintiff would simply have to wait outside until she could get someone's attention to let her into the school because all the other school doors were locked. (*Id.* at p. 36). Plaintiff told school personnel about her accessibility problems several times, but eventually quit complaining after she learned it was futile. (*Id.* at p. 38). Plaintiff also experienced problems during her senior year in attending a class-sponsored "senior trip" and in events leading up to her graduation ceremony. (*Id.* at pp. 125–31, 116–19).

Every day Plaintiff attended high school, she felt like she was not a regular person. (*Id.*, Exh. E, at p. 81). Despite her difficulties, Plaintiff graduated from Cokeville High School in May 2002 with a 3.67 grade point average. (Pl.'s Resp., at p. 3, ¶ 2).

### *Legal Standard*

Summary judgment is proper when there is no genuine issue of material fact to be resolved at trial. Fed.R.Civ.P. 56(c); *Nebraska v. Wyoming*, 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993).

---

**5.** Plaintiff also had accessibility problems when she would travel to the Star Valley High School in Afton, Wyoming to watch family and friends participate in extracurricular activities. (Pl.'s Resp., Exh. A, at ¶ 8). Plaintiff also had difficulties participating in home economics courses because the rooms were not equipped for disabled persons. (*Id.*, Exh. E, at p. 83).

**6.** Defendant has introduced no evidence to this effect. In Defendant's brief, it cites "Deposition Exhibit 3, Steve Swenson Deposi-

tion" for this proposition. (Def.'s Mem. in Supp. of Mot. for Summ. J., at pp. 4–5, ¶ 9). However, that exhibit was not attached to Defendant's brief, and the Court is unable to locate it in the materials on file. In any event, it is largely irrelevant for purposes of this motion since Plaintiff graduated in May 2002 and testified that she had accessibility problems during the 2001–2002 school year, which is before the School District had satisfactorily resolved all the accessibility issues in July 2002.

Thus, a district court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Nelson v. Geringer*, 295 F.3d 1082, 1086 (10th Cir.2002). "An issue of material fact is genuine where a reasonable jury could return a verdict for the party opposing summary judgment." *Seymore v. Shawver & Sons, Inc.*, 111 F.3d 794, 797 (10th Cir.1997).

In applying these standards, the district court will view the evidence in the light most favorable to the party opposing summary judgment. *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir.1996). The movant bears the initial burden of demonstrating the absence of evidence to support the non-moving party's claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the non-moving party bears the burden of proof at trial, the burden then shifts to it to demonstrate the existence of an essential element of its case. *Id.* To carry this burden, the non-moving party must go beyond the pleadings and designate specific facts to show there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Ford v. West*, 222 F.3d 767, 774 (10th Cir.2000). The mere existence of a scintilla of evidence in support of the non-moving party's position is insufficient to create a "genuine" issue of disputed fact. *Lawmaster v. Ward*, 125 F.3d 1341, 1347 (10th Cir.1997).

In discrimination cases, where intent and credibility issues inhere, summary judgment standards should be applied strenuously. *See Stewart v. Rutgers, State Univ.*, 120 F.3d 426, 431 (3d Cir.1997).

### *Analysis*

Plaintiff's Complaint alleges that the School District: (1) discriminated against her in violation of Title II of the Americans with Disabilities Act of 1990 ("ADA"), (Pl.'s Compl., at ¶¶ 12–16); (2) discriminated against her in violation of the Rehabilitation Act of 1973, (*id.* at ¶¶ 17–22); and (3) violated the Individuals with Disabilities Education Act ("IDEA"), (*id.* at ¶¶ 23–25). Defendant has moved for summary judgment on all three counts.

I. *Plaintiff's ADA and Rehabilitation Act Claims.*

Defendant argues it is entitled to summary judgment on Plaintiff's ADA and Rehabilitation Act claims for several reasons.

A. Statute of Limitations under Title II of the ADA and the Rehabilitation Act.

Defendant argues that Plaintiff's claims prior to August 20, 2000, are time-barred under a two-year Wyoming statute of limitations.[7] (Def.'s Mem., at pp. 20–22). Plaintiff responds that the appropriate statute of limitations for her ADA and Rehabilitation Act claims is Wyoming's four-year personal injury statute of limitations. (Pl.'s Resp., at pp. 20–22).

1. The Appropriate Statute of Limitations for ADA and Rehabilitation Act Claims in Wyoming.

■ Congress did not provide specific statutes of limitations for claims brought under the ADA or the Rehabilitation Act. In the absence of an explicit statute of

---

7. Wyo. Stat. Ann. § 1–3–115 provides:
 All actions upon a liability created by federal statute, other than a forfeiture or penalty, for which no period of limitations is provid- ed in such statute, shall be commenced within two years after the cause of action has accrued.

limitations, a federal court should adopt the most analogous state statute of limitations. *Wilson v. Garcia,* 471 U.S. 261, 268, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). The Tenth Circuit has held that a claim under section 504 of the Rehabilitation Act, like a claim under 42 U.S.C. § 1983, is characterized as a claim for personal injuries. *Baker v. Bd. of Regents of Kan.,* 991 F.2d 628, 632 (10th Cir.1993). Several courts have held that an ADA claim, like Rehabilitation Act and § 1983 claims, should be characterized as a claim for personal injuries. *See Larson v. Snow College,* 189 F.Supp.2d 1286, 1295–96 (D.Utah 2000) (collecting cases).

■ This Court has held that § 1983 claims brought in the District of Wyoming are controlled by Wyoming's statute of limitations for personal injury actions. *Sullivan v. Bailiff,* 867 F.Supp. 992, 996 (D.Wyo.1994). Under that statute, the limitations period is four years. Wyo. Stat. Ann. § 1–3–105(a)(iv)(C).[8] In *Bailiff,* this Court specifically rejected application of Wyo. Stat. Ann. § 1–3–115 in a § 1983 action because individual states do not have the power to limit the viability of a federal civil rights cause of action. 867 F.Supp. at 995. That reasoning is analogous to claims brought under the ADA and the Rehabilitation Act. Thus,

> [t]he statute of limitations for [ADA and Rehabilitation Act] actions brought in the District of Wyoming is controlled by Wyoming's statute of limitations for personal injury actions. Wyo. Stat. § 1–3–105(a)(iv)(C). That period is four years.

*Id.* at 996.

2. Application.

Plaintiff filed her Complaint in this matter on August 21, 2002. Thus, Plaintiff's ADA and Rehabilitation Act claims encompass all alleged discriminatory acts by the School District beginning on August 21, 1998. Plaintiff, however, invites this Court to recognize a "hostile education environment" claim, akin to a hostile work environment claim under Title VII of the Civil Rights Act of 1964. (Pl.'s Resp., at pp. 20–22). Such a theory would make a defendant liable for all discriminatory acts that constitute part of that single hostile environment claim, so long as one discriminatory act occurred within the limitations period. *See Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 117, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). The Court declines Plaintiff's invitation because the majority of her allegations center around the School District's alleged discriminatory treatment of her during high school. These claims are not time-barred under the four-year personal injury statute of limitation thereby making an unprecedented extension of the law unnecessary in this particular case.

B. Intentional Discrimination Claims under the ADA and the Rehabilitation Act.

Defendant argues that it is entitled to summary judgment on Plaintiff's ADA and Rehabilitation Act claims because Plaintiff cannot demonstrate "bad faith" or "gross misjudgment" on the part of the School District. (Def.'s Mem., at pp. 16–18). Defendant also argues it did not violate the ADA or Rehabilitation Act because it provided Plaintiff with a full-time physical aide as an accommodation for her disability. (*Id.* at pp. 12–16). Plaintiff responds that the appropriate standard in the Tenth Circuit for analyzing intentional discrimi-

---

**8.** Wyo. Stat. Ann. § 1–3–105(a)(iv)(C) provides:

> (a) Civil actions other than for the recovery of real property can only be brought within the following periods after the cause of ac-

tion accrues: (iv) Within four (4) years, an action for: (C) An injury to the rights of the plaintiff, not arising on contract and not herein enumerated.

nation claims under Title II of the ADA and Rehabilitation Act is deliberate indifference. (Pl.'s Resp., at pp. 17–20). Plaintiff also contends that simply because the School District provided her with an accommodation does not preclude her intentional discrimination claim. (*Id.*).

1. Title II of the ADA.

▇▇▇▇ Title II of the ADA prohibits discrimination in public services furnished by governmental entities. 42 U.S.C. §§ 12131–12165.[9] Title II of the ADA provides that:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. Three theories of discrimination are available to a plaintiff alleging a violation of Title II of the ADA: (1) intentional discrimination; (2) discriminatory impact; and (3) a refusal to make a reasonable modification.[10] *See Tsombanidis v. City of West Haven, Conn.*, 180 F.Supp.2d 262, 283 (D.Conn.2001). In order to state a claim under Title II of the ADA, a plaintiff must prove that: (1) she is a qualified individual with a disability; (2) she was excluded from the benefits or services of a public entity or otherwise was discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was because of her disability. *Gohier v. Enright*, 186 F.3d 1216, 1219 (10th Cir.1999).

Under Title II of the ADA, a "qualified individual with a disability" is someone who, with or without reasonable modifications, meets the essential eligibility requirements to receive public services or participate in a public program. 42 U.S.C. § 12131(2). The ADA defines "disability" as a "physical or mental impairment that substantially limits one or more of the major life activities of the individual." 42 U.S.C. § 12102(2)(A). Cerebral palsy has been held to be a disability under the ADA. *Duty v. Norton–Alcoa Proppants*, 293 F.3d 481, 499 (8th Cir.2002); *Coleman v. Zatechka*, 824 F.Supp. 1360, 1366 (D.Neb.1993).

▇▇▇ Under Title II of the ADA, a "public entity" includes any special purpose district or other instrumentality of the state or local government. 42 U.S.C. § 12131(1). A school district is a "public entity" under Title II of the ADA. *DeBord v. Bd. of Educ. of Ferguson–Florissant Sch. Dist.*, 126 F.3d 1102, 1104 (8th Cir. 1997).

2. Section 504 of the Rehabilitation Act.

Section 504 of the Rehabilitation Act prohibits discrimination against disabled persons who are otherwise qualified for participation in programs receiving federal funds. 29 U.S.C. § 794(a). The Rehabilitation Act defines "disability" similar to that of the ADA. *Id.* § 705(21); *McGuinness v. Univ. of N.M. Sch. of Med.*, 170 F.3d 974, 980 (10th Cir.1998).

To state a claim for disability discrimination under the Rehabilitation Act, a

---

**9.** Title II of the ADA includes a "Part A," which governs public services generally, §§ 12131–12134, and a "Part B," which governs public transportation services, §§ 12135–12165. Only "Part A" of Title II is applicable to this case.

**10.** Title II of the ADA uses the term "reasonable modification," whereas Title I of the ADA

uses the term "reasonable accommodation." Notwithstanding the different statutory language, there appears to be little substantive difference between the terms. *See* 42 U.S.C. § 12111(9),(10); 28 C.F.R. § 35.130(b)(7); *Wong v. Regents of the Univ. of Cal.*, 192 F.3d 807, 816 n. 26 (9th Cir.1999).

plaintiff must prove the same elements required to prevail under Title II of the ADA. *Nielsen v. Moroni Feed Co.*, 162 F.3d 604, 608 n. 7 (10th Cir.1998). The elements of a cause of action under Title II of the ADA and section 504 of the Rehabilitation Act are the same because Congress has directed courts to construe the ADA as giving at least the same amount of protection as the Rehabilitation Act. *See* 42 U.S.C. § 12201(a); *DeBord,* 126 F.3d at 1104–05; *Baird v. Rose,* 192 F.3d 462, 468 (4th Cir.1999).

3. Damages under Title II of the ADA and Section 504 of the Rehabilitation Act.

The remedies for a violation of Title II of the ADA and section 504 of the Rehabilitation Act are coextensive with each other and linked to Title VI of the Civil Rights of Act of 1964. 42 U.S.C. § 12133; 29 U.S.C. § 794a(a)(2); 42 U.S.C. § 2000d–7(a)(2). Under Title VI, a plaintiff cannot recover compensatory damages unless she proves intentional discrimination. *Alexander v. Sandoval,* 532 U.S. 275, 282–83, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001).

The Tenth Circuit has held that to be entitled to compensatory damages under section 504 of the Rehabilitation Act, a plaintiff must prove the defendant intentionally discriminated against her on the basis of disability. *Powers v. MJB Acquisition Corp.,* 184 F.3d 1147, 1153 (10th Cir.1999). The Tenth Circuit explained that "intentional discrimination can be inferred from a defendant's deliberate indifference to the strong likelihood that pur-

suit of its questioned policies will likely result in a violation of federally protected rights." *Id.*

Compensatory damages are likewise available under Title II of the ADA. 42 U.S.C. § 12133. However, the Tenth Circuit has never held that Title II of the ADA requires proof of intentional discrimination in order for a plaintiff to be entitled to compensatory damages. *Davoll v. Webb,* 194 F.3d 1116, 1142 (10th Cir.1999) (specifically declining to address the issue); *Meyers v. Colo. Dep't of Human Services,* No. 02–1054, 2003 WL 1826166, *2 (10th Cir.2003) (unpublished).

■■■■ This Court finds that because Title II of the ADA and section 504 of the Rehabilitation Act both require proof that a public entity discriminated against a plaintiff on the basis of her disability, the standard for awarding compensatory damages under both statutes should likewise be the same.[11] Therefore, this Court concludes that to be entitled to compensatory damages under Title II of the ADA, a plaintiff must prove the defendant intentionally discriminated against her on the basis of disability. *See Delano–Pyle v. Victoria County, Tex.,* 302 F.3d 567, 574 (5th Cir.2002); *Duvall v. County of Kitsap,* 260 F.3d 1124, 1138 (9th Cir.2001). The standard for proving intentional discrimination under Title II of the ADA is the same deliberate indifference standard employed under the Rehabilitation Act. *Powers,* 184 F.3d at 1153; *Delano–Pyle,* 302 F.3d at 575; *Duvall,* 260 F.3d at 1138.[12]

---

**11.** The ADA's statutory scheme also supports this construction. Title II of the ADA provides the same remedies set forth in 29 U.S.C. § 794a. 42 U.S.C. § 12133. In turn, § 794a(a)(2) provides for the remedies available under Title VI of the Civil Rights Act. The Supreme Court has held that intentional discrimination must be proven before compensatory damages can be awarded under Title VI.

*See Sandoval,* 532 U.S. at 282–83, 121 S.Ct. 1511.

**12.** The Eighth Circuit, and possibly the Eleventh Circuit, apply a "bad faith" or "gross misjudgment" standard for holding a public entity liable under the Rehabilitation Act and Title II of the ADA. *Birmingham v. Omaha Sch. Dist.,* 220 F.3d 850, 856 (8th Cir.2000);

The Supreme Court has held that punitive damages may not be awarded in a private suit brought under Title II of the ADA or section 504 of the Rehabilitation Act. *Barnes v. Gorman,* 536 U.S. 181, 189, 122 S.Ct. 2097, 153 L.Ed.2d 230 (2002).

4. Application.

Plaintiff's Complaint alleges that Defendant intentionally discriminated against her on the basis of her disability. (Pl.'s Compl., at ¶¶ 12–22). Plaintiff does not proceed under a reasonable modification/accommodation theory. (*See id.*). Defendant does not dispute that Plaintiff is a "qualified individual with a disability" or that the School District is a "public entity" under the Rehabilitation Act and Title II of the ADA. Thus, the only questions are whether Plaintiff has demonstrated that the School District discriminated against her, and if so, whether such discrimination was because of her disability. *See Gohier,* 186 F.3d at 1219.

The Court finds that Plaintiff has carried her summary judgment burden on both elements for several reasons. First, Defendant admits that it knowingly violated Title II of the ADA. (Def.'s Answer, at ¶¶ 12, 14). The ADA does not provide any exceptions for what Defendant perceives as "minor technical violations." These "minor technical violations" of the ADA resulted in, for one example, Plaintiff and her family having to park across the street from the high school and then trek through the snow to attend a performance in the auditorium because there were no handicapped parking spaces marked or available. Plaintiff has also presented ample evidence that Defendant was aware that its policies were in violation of Plaintiff's federally protected rights. The School District's superintendent, principals, and special services director were all aware that the Cokeville High School was not ADA compliant, yet they failed to make the high school compliant before Plaintiff graduated.

Defendant contends, however, that its violations of the ADA were remedied because Plaintiff was provided with a full-time aide. This argument fails for three reasons. First, Plaintiff testified that there were many times during the school day when her aide, Ms. Roberts, did not arrive at school until the third period, and on several of those occasions, Plaintiff could not gain access to the school in the morning unless she used alternate routes. Plaintiff also testified that Ms. Roberts missed a substantial amount of school during her senior year and that when Ms. Roberts was at school, she did not feel it was her duty to remove other children (or faculty) when they were seated in handicap designated areas. Second, the full-time aide was not available for extracurricular activities, which is an essential component of the educational experience. Simply because Plaintiff is disabled does not mean that she is entitled to only one facet, such as classroom learning, of the educational experience.

Third, and most importantly, Defendant's accommodation argument misconstrues the nature of Plaintiff's intentional discrimination claim. Plaintiff has alleged that the School District discriminated against her by treating her as a second-class citizen, which caused her humiliation and mental anguish. In support to this claim, Plaintiff has pointed to evidence that the School District had a negative attitude towards ADA compliance, and that as a result of this attitude, every school day was a struggle for Plaintiff. As such, whether the School District accommodated Plaintiff during some of the school day may be a mitigating factor the

*Wood v. President and Trustees of Spring Hill Coll.,* 978 F.2d 1214, 1219 (11th Cir.1992).

jury can consider in Plaintiff's claim; however, it does not preclude that claim altogether. *See, e.g., United States v. City & County of Denver*, 49 F.Supp.2d 1233, 1243–44 (D.Colo.1999) (noting that Title II of the ADA only permits the affirmative defense of undue hardship).

Plaintiff has presented evidence that raises a genuine issue of material fact that the School District discriminated against her because of her disability. At trial, if Plaintiff establishes that the School District intentionally discriminated against her by its deliberate indifference to the strong likelihood that pursuit of its policies would result in a violation of her federally protected rights, then Plaintiff will be entitled to compensatory damages under the Rehabilitation Act and Title II of the ADA. The Court rejects Defendant's argument that a Plaintiff must show "bad faith" or "gross misjudgment" to prevail on her claims under the Rehabilitation Act or Title II of the ADA because that minority approach has not been adopted by the Tenth Circuit.

Defendant also makes several other arguments which will be addressed briefly. Defendant argues that the Court should "strike" various factual allegations, which occurred during the school day, relating to Plaintiff's discrimination claim. (Def.'s Mem., at pp. 22–24). This argument fails procedurally and on its merits. A proper motion to strike must be filed in accordance with the strictures of Fed.R.Civ.P. 12(f). Additionally, even if the Court were inclined to grant summary judgment on piecemeal facts arising out of a single claim, this would not be the proper case for such action because Plaintiff has presented evidence that she had continual access problems to the high school during the day in her senior year.

■ Defendant also argues that Plaintiff does not have "standing" to assert any claims regarding the Star Valley High School where she attended sporting events as a spectator because she was not a student at that school. (*Id.* at pp. 26–27). Defendant has not directed this Court to any decision in support of such an argument, nor has the Court been able to locate any. In fact, if such a rule existed, it would effectively read Title II out of the ADA. For example, only a librarian could claim that the public library was not ADA compliant, or only the judge could assert that the county courthouse was not handicap accessible.

■ Defendant also contends that Plaintiff has no "standing" to assert her claims relating to Defendant's failure to comply with the OCR complaint because the complaint has been resolved. (*Id.* at pp. 27–29). This argument fails because the complaint was not resolved until after Plaintiff graduated, and neither Title II of the ADA, nor the Rehabilitation Act, has an exhaustion requirement. *Davoll v. Webb*, 943 F.Supp. 1289, 1297 (D.Colo. 1996).

■ Finally, Defendant argues that Plaintiff cannot maintain a claim based on allegations that the School District discriminated against her with regard to the senior class trip because that trip did not require any school district funding and was planned solely by the senior class. (*Id.* at pp. 18–20). Aside from being another piece of the factual puzzle in this case, there is evidence in the record that the School District did have control and authority over the senior trip. For example, Defendant introduced the "Permission Slip for the Senior Class Trip" during Plaintiff's deposition, which indicates that the School District played some role in the senior trip. (Pl.'s Resp., Exh. E, at p. 131; Exh. O (Depo.Exh. 7)).

### C. Conclusion.

For the aforementioned reasons, Defendant's Motion for Summary Judgment on Count I and Count II of Plaintiff's Complaint—Violation of Title II of the ADA and Section 504 of the Rehabilitation Act—is **DENIED**.

### II. *Plaintiff's IDEA Claim.*

Defendant argues that it is entitled summary judgment on Plaintiff's claim under the IDEA because she has no remedy under the Act, since she has graduated from Cokeville High School. (Def.'s Mem., at pp. 7–10). Plaintiff argues that because she is no longer in high school and cannot now avail herself of the IDEA remedies that would be available in the context of an IDEA administrative hearing, compensatory damages should be awarded for Defendant's violation of the Act. (Pl.'s Resp., at pp. 16–17).

### A. The Individuals with Disabilities Education Act.

The IDEA, 20 U.S.C. §§ 1400–1487, was enacted to ensure that all disabled children were provided with a free appropriate public education in the least restrictive environment. *Polera v. Bd. of Educ. of Newburgh Enlarged City Dist.,* 288 F.3d 478, 481 (2nd Cir.2002). To that end, the "IDEA provides a panoply of procedural rights to parents to ensure their involvement in decisions about their disabled child's education." *Sellers v. Sch. Bd. of the City of Manassas, Virginia,* 141 F.3d 524, 527 (4th Cir.1998); *see also Cudjoe v. Indep. Sch. Dist. No. 12,* 297 F.3d 1058, 1064 (10th Cir.2002) (explaining the procedural safeguards available to parents under the IDEA). The IDEA provides a "straightforward and explicit requirement" that a plaintiff exhaust her administrative remedies under the Act before filing a civil action in federal court. *Id.;* 20 U.S.C. § 1415(1).

The Tenth Circuit has not addressed whether punitive or compensatory damages are available in civil actions, properly filed after exhaustion, under the IDEA. *Id.* at 1067 n. 10 (specifically declining to address the issue); *Padilla v. Sch. Dist. No. 1 in the City and County of Denver,* 233 F.3d 1268, 1274 (10th Cir.2000) (same). However, the Second, Fourth, Sixth, Seventh, Eighth, Ninth, and Eleventh Circuits have all concluded that damages are not available in a civil action for a violation of the IDEA because such an award is inconsistent with the statutory scheme. *See Polera,* 288 F.3d at 485–86 (collecting cases); *Sellers,* 141 F.3d at 528 (collecting cases).

### B. Application.

■ Although the Tenth Circuit has not addressed the issue, this Court agrees with the clear weight of authority that an award of compensatory or punitive damages would be inconsistent with the statutory scheme and purpose of the IDEA. Therefore, this Court concludes that compensatory and punitive damages are not available in a claim under the IDEA. Plaintiff has graduated from Cokeville High School and cannot now avail herself of the administrative remedies available under the IDEA. Therefore, Plaintiff has no remedy under the Act, and Defendant's Motion for Summary Judgment on Count III of Plaintiff's Complaint—violation of the IDEA—is **GRANTED**.

### Conclusion

For the aforementioned reasons, Defendant's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**. Defendant's Motion for Summary Judgment is **GRANTED** on Count III of Plaintiff's Complaint, alleging a violation of the Individuals with Disabilities Education Act. Defendant's Motion for Summary

Judgment is **DENIED** on Counts I and II of Plaintiff's Complaint, alleging a violation of the Rehabilitation Act and Title II of the Americans with Disabilities Act.