BARNES, IN HER OFFICIAL CAPACITY AS MEMBER OF
THE BOARD OF POLICE COMMISSIONERS OF
KANSAS CITY MISSOURI, ET AL. *v.* GORMAN

No. 01–682.   Argued April 23, 2002—Decided June 17, 2002

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, KENNEDY, SOUTER, and THOMAS, JJ., joined. SOUTER, J., filed a concurring opinion, in which O'CONNOR, J., joined, *post*, p. 190. STEVENS, J., filed an opinion concurring in the judgment, in which GINSBURG and BREYER, JJ., joined, *post*, p. 191.

*Lawrence S. Robbins* argued the cause for petitioners. With him on the briefs were *Roy T. Englert, Jr., Alan E. Untereiner, Arnon D. Siegel,* and *Dale H. Close.*

*Gregory G. Garre* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Olson, Assistant Attorneys General Boyd* and *McCallum, Deputy Solicitor General Clement, Jessica Dunsay Silver,* and *Gregory B. Friel.*

*Scott L. Nelson* argued the cause for respondent. With him on the brief were *Brian Wolfman, John M. Simpson,* and *Connie Knight Sieracki.*\*

---

\*Briefs of *amici curiae* urging reversal were filed for the State of Hawaii et al. by *Earl I. Anzai,* Attorney General of Hawaii, and *Dorothy D. Sellers* and *Adina L. K. Cunningham,* Deputy Attorneys General, joined by *Robert R. Rigsby,* Corporation Counsel of the District of Columbia, and the Attorneys General for their respective States as follows: *Robert A. Butterworth* of Florida, *Steve Carter* of Indiana, *G. Steven Rowe* of Maine, *J. Joseph Curran, Jr.,* of Maryland, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *David Samson* of New Jersey, *Wayne Stenehjem* of North Dakota, *Betty D. Montgomery* of Ohio, *W. A. Drew Edmondson* of Oklahoma, *Hardy Myers* of Oregon, *Mark L. Shurtleff* of Utah, and *Hoke MacMillan* of Wyoming; for the California Municipalities et al. by *Samuel L. Jackson, Pamela Albers, Michael G. Colantuono, Ronald R. Ball, Michael F. Dean, John L. Cook, Charles E. Dickerson III,*

JUSTICE SCALIA delivered the opinion of the Court.

We must decide whether punitive damages may be awarded in a private cause of action brought under § 202 of the Americans with Disabilities Act of 1990 (ADA), 104 Stat. 337, 42 U. S. C. § 12132 (1994 ed.), and § 504 of the Rehabilitation Act of 1973, 87 Stat. 394, 29 U. S. C. § 794(a).

## I

Respondent Jeffrey Gorman, a paraplegic, is confined to a wheelchair and lacks voluntary control over his lower torso, including his bladder, forcing him to wear a catheter attached to a urine bag around his waist. In May 1992, he was arrested for trespass after fighting with a bouncer at a Kansas City, Missouri, nightclub. While waiting for a police van to transport him to the station, he was denied permission to use a restroom to empty his urine bag. When the van arrived, it was not equipped to receive respondent's wheelchair. Over respondent's objection, the officers removed him from his wheelchair and used a seatbelt and his own belt to strap him to a narrow bench in the rear of the van. During the ride to the police station, respondent released his seatbelt, fearing it placed excessive pressure on his urine bag. Eventually, the other belt came loose and respondent fell to the floor, rupturing his urine bag and injuring his shoulder and back. The driver, the only officer in the van, finding it impossible to lift respondent, fastened him to a support for the remainder of the trip. Upon arriv-

*Joel D. Kuperberg, Philip D. Kohn, John Sanford Todd, Robert E. Shannon, Joseph A. Soldani, William B. Conners, Gregory P. Priamos, Hadden Roth, James F. Penman, George Rios, Brien J. Farrell, Valerie J. Armento, Debra E. Corbett, J. Wallace Wortham, Jr., A. Scott Chinn, Karl F. Dean, Michael Cardozo, Nelson A. Diaz, Jeffrey L. Rogers, John C. Wolfe,* and *Harry Morrison, Jr.;* and for the International City/County Management Association et al. by *Richard Ruda* and *James I. Crowley.*

*Jeffrey Robert White* filed a brief for the Association of Trial Lawyers of America et al. as *amici curiae* urging affirmance.

ing at the station, respondent was booked, processed, and released; later he was convicted of misdemeanor trespass. After these events, respondent suffered serious medical problems—including a bladder infection, serious lower back pain, and uncontrollable spasms in his paralyzed areas—that left him unable to work full time.

Respondent brought suit against petitioners—members of the Kansas City Board of Police Commissioners, the chief of police, and the officer who drove the van—in the United States District Court for the Western District of Missouri. The suit claimed petitioners had discriminated against respondent on the basis of his disability, in violation of § 202 of the ADA and § 504 of the Rehabilitation Act, by failing to maintain appropriate policies for the arrest and transportation of persons with spinal cord injuries.

A jury found petitioners liable and awarded over $1 million in compensatory damages and $1.2 million in punitive damages. The District Court vacated the punitive damages award, holding that punitive damages are unavailable in suits under § 202 of the ADA and § 504 of the Rehabilitation Act. The Court of Appeals for the Eighth Circuit reversed, relying on this Court's decision in *Franklin* v. *Gwinnett County Public Schools*, 503 U. S. 60, 70–71 (1992), which stated the "general rule" that "absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute." Punitive damages are appropriate relief, the Eighth Circuit held, because they are "an integral part of the common law tradition and the judicial arsenal," 257 F. 3d 738, 745 (2001), and Congress did nothing to disturb this tradition in enacting or amending the relevant statutes, *id.*, at 747. We granted certiorari. 534 U. S. 1103 (2002).

## II

Section 202 of the ADA prohibits discrimination against the disabled by public entities; § 504 of the Rehabilitation Act

prohibits discrimination against the disabled by recipients of federal funding, including private organizations, 29 U. S. C. § 794(b)(3). Both provisions are enforceable through private causes of action. Section 203 of the ADA declares that the "remedies, procedures, and rights set forth in [§ 505(a)(2) of the Rehabilitation Act] shall be the remedies, procedures, and rights this subchapter provides" for violations of § 202. 42 U. S. C. § 12133. Section 505(a)(2) of the Rehabilitation Act, in turn, declares that the "remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 . . . shall be available" for violations of § 504, as added, 92 Stat. 2983, 29 U. S. C. § 794a(a)(2). Thus, the remedies for violations of § 202 of the ADA and § 504 of the Rehabilitation Act are coextensive with the remedies available in a private cause of action brought under Title VI of the Civil Rights Act of 1964, 42 U. S. C. § 2000d *et seq.*, which prohibits racial discrimination in federally funded programs and activities.

Although Title VI does not mention a private right of action, our prior decisions have found an *implied* right of action, *e. g., Cannon* v. *University of Chicago*, 441 U. S. 677, 703 (1979), and Congress has acknowledged this right in amendments to the statute, leaving it "beyond dispute that private individuals may sue to enforce" Title VI, *Alexander* v. *Sandoval*, 532 U. S. 275, 280 (2001). It is less clear what remedies are available in such a suit. In *Franklin, supra*, at 73, we recognized "the traditional presumption in favor of *any appropriate relief* for violation of a federal right," and held that since this presumption applies to suits under Title IX of the Education Amendments of 1972, 20 U. S. C. §§ 1681–1688, monetary damages were available. (Emphasis added.) And the Court has interpreted Title IX consistently with Title VI, see *Cannon, supra*, at 694–698. *Franklin*, however, did not describe the scope of "appropriate relief." We take up this question today.

Title VI invokes Congress's power under the Spending Clause, U. S. Const., Art. I, § 8, cl. 1, to place conditions on

the grant of federal funds. See *Davis* v. *Monroe County Bd. of Ed.*, 526 U. S. 629, 640 (1999) (Title IX). We have repeatedly characterized this statute and other Spending Clause legislation as "much in the nature of a *contract:* in return for federal funds, the [recipients] agree to comply with federally imposed conditions." *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1, 17 (1981) (emphasis added);[1] see also *Davis, supra,* at 640; *Gebser* v. *Lago Vista Independent School Dist.,* 524 U. S. 274, 286 (1998); *Guardians Assn.* v. *Civil Serv. Comm'n of New York City,* 463 U. S. 582, 599 (1983) (opinion of White, J.); *id.,* at 632–633 (Marshall, J., dissenting); *Lau* v. *Nichols,* 414 U. S. 563, 568–569 (1974). Just as a valid contract requires offer and acceptance of its terms, "[t]he legitimacy of Congress' power to legislate under the spending power . . . rests on whether the [recipient] voluntarily and knowingly accepts the terms of the 'contract.' . . . Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Pennhurst, supra,* at 17; see also *Davis, supra,* at 640; *Gebser, supra,* at 287; *Franklin,* 503 U. S., at 74. Although we have been careful not to imply that *all* contract-law rules apply to Spending Clause legislation, see, *e. g., Bennett* v. *Kentucky Dept. of Ed.,* 470 U. S. 656, 669 (1985) (Title I), we have regularly applied the contract-law analogy in cases defining the scope of conduct for which funding recipients may be held liable for money damages. Thus,

---

[1] JUSTICE STEVENS believes that our reliance on *Pennhurst* is "inappropriate" because that case addressed legislation imposing affirmative obligations on recipients whereas Title VI "simply prohibit[s] certain discriminatory conduct." *Post,* at 192 (opinion concurring in judgment). He does not explain why he thinks this distinction—which played no role in the Court's application of contract-law principles in *Pennhurst,* 451 U. S., at 24–25—ought to make a difference. Whatever his reason, we have regularly applied *Pennhurst's* contract analogy to legislation that "simply prohibit[s] certain discriminatory conduct." See, *e. g., Davis* v. *Monroe County Bd. of Ed.,* 526 U. S. 629, 640 (1999) (Title IX); *Gebser* v. *Lago Vista Independent School Dist.,* 524 U. S. 274, 287 (1998) (same).

a recipient may be held liable to third-party beneficiaries for intentional conduct that violates the clear terms of the relevant statute, *Davis, supra,* at 642, but not for its failure to comply with vague language describing the objectives of the statute, *Pennhurst, supra,* at 24–25; and, if the statute implies that only violations brought to the attention of an official with power to correct them are actionable, not for conduct unknown to any such official, see *Gebser, supra,* at 290. We have also applied the contract-law analogy in finding a damages remedy available in private suits under Spending Clause legislation. *Franklin, supra,* at 74–75.

The same analogy applies, we think, in determining the *scope* of damages remedies. We said as much in *Gebser:* "Title IX's contractual nature has implications for our construction of the scope of available remedies." 524 U. S., at 287. One of these implications, we believe, is that a remedy is "appropriate relief," *Franklin,* 503 U. S., at 73, only if the funding recipient is *on notice* that, by accepting federal funding, it exposes itself to liability of that nature. A funding recipient is generally on notice that it is subject not only to those remedies explicitly provided in the relevant legislation, but also to those remedies traditionally available in suits for breach of contract. Thus we have held that under Title IX, which contains no express remedies, a recipient of federal funds is nevertheless subject to suit for compensatory damages, *id.,* at 76, and injunction, *Cannon, supra,* at 711–712, forms of relief traditionally available in suits for breach of contract. See, *e. g.,* Restatement (Second) of Contracts § 357 (1981); 3 S. Williston, Law of Contracts §§ 1445–1450 (1920); J. Pomeroy, A Treatise on the Specific Performance of Contracts 1–5 (1879). Like Title IX, Title VI mentions no remedies—indeed, it fails to mention even a private right of action (hence this Court's decision finding an *implied* right of action in *Cannon*). But punitive damages, unlike compensatory damages and injunction, are generally not available for breach of contract, see 3 E. Farnsworth, Contracts § 12.8,

pp. 192–201 (2d ed. 1998); Restatement (Second) of Contracts § 355; 1 T. Sedgwick, Measure of Damages § 370 (8th ed. 1891).

Nor (if such an interpretive technique were available) could an *implied* punitive damages provision reasonably be found in Title VI. Some authorities say that reasonably implied contractual terms are those that the parties would have agreed to if they had adverted to the matters in question. See 2 Farnsworth, *supra*, § 7.16, at 335, and authorities cited. More recent commentary suggests that reasonably implied contractual terms are simply those that "compor[t] with community standards of fairness," Restatement (Second) of Contracts, *supra*, § 204, Comment *d;* see also 2 Farnsworth, *supra*, § 7.16, at 334–336. Neither approach would support the implication here of a remedy that is not normally available for contract actions and that is of indeterminate magnitude. We have acknowledged that compensatory damages alone "might well exceed a recipient's level of federal funding," *Gebser, supra,* at 290; punitive damages on top of that could well be disastrous. Not only is it doubtful that funding recipients would have agreed to exposure to such unorthodox and indeterminate liability; it is doubtful whether they would even have *accepted the funding* if punitive damages liability was a required condition. "Without doubt, the scope of potential damages liability is one of the most significant factors a school would consider in deciding whether to receive federal funds." *Davis, supra,* at 656 (KENNEDY, J., dissenting). And for the same reason of unusual and disproportionate exposure, it can hardly be said that community standards of fairness support such an implication. In sum, it must be concluded that Title VI funding recipients have not, merely by accepting funds, implicitly consented to liability for punitive damages.[2]

---

[2] We cannot understand JUSTICE STEVENS' Chicken-Little statement that today's decision "has potentially far-reaching consequences that go well beyond the issues briefed and argued in this case." *Post,* at 192–193. Our decision merely applies a principle expressed and applied many times

Our conclusion is consistent with the "well settled" rule that "where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." *Bell* v. *Hood*, 327 U. S. 678, 684 (1946); see also *Franklin, supra,* at 66. When a federal-funds recipient violates conditions of Spending Clause legislation, the wrong done is the failure to provide what the contractual obligation requires; and that wrong is "made good" when the recipient *compensates* the Federal Government or a third-party beneficiary (as in this case) for the loss caused by that failure. See *Guardians,* 463 U. S., at 633 (Marshall, J., dissenting) ("When a court concludes that a recipient has breached its contract, it should enforce the broken promise by protecting the expectation that the recipient would not discriminate. . . . The obvious way to do this is to put private parties in as good a position as they would have been had the contract been performed"). Punitive damages are not compensatory, and are therefore not embraced within the rule described in *Bell.*

\* \* \*

Because punitive damages may not be awarded in private suits brought under Title VI of the 1964 Civil Rights Act, it follows that they may not be awarded in suits brought under § 202 of the ADA and § 504 of the Rehabilitation Act.[3] This

---

before: that the "contractual nature" of Spending Clause legislation "has *implications* for our construction of the scope of available remedies." *Gebser,* 524 U. S., at 287 (emphasis added). We do not imply, for example, that suits under Spending Clause legislation are suits in contract, or that contract-law principles apply to all issues that they raise. Since JUSTICE STEVENS is unable to identify any "far-reaching consequenc[e]" that might reasonably follow from our decision today, and since we are merely occupying ground that the Court has long held, we surely do not deserve his praise that we are "fearless crusaders," *post,* at 193, n. 2.

[3] JUSTICE STEVENS believes that our analysis of Title VI does not carry over to the ADA because the latter is not Spending Clause legislation, and identifies "tortious conduct." *Post,* at 192, 193, n. 2. Perhaps he thinks that it *should not* carry over, but that is a question for Congress, and

makes it unnecessary to reach petitioners' alternative argument—neither raised nor passed on below[4]—invoking the traditional presumption against imposition of punitive damages on government entities. *Vermont Agency of Natural Resources* v. *United States ex rel. Stevens,* 529 U. S. 765, 784–785 (2000); *Newport* v. *Fact Concerts, Inc.,* 453 U. S. 247, 262–263 (1981). The judgment of the Court of Appeals is reversed.

*It is so ordered.*

JUSTICE SOUTER, with whom JUSTICE O'CONNOR joins, concurring.

I join the Court's opinion because I agree that analogy to the common law of contract is appropriate in this instance, with the conclusion that punitive damages are not available under the statute. Punitive damages, as the Court points out, may range in orders of "indeterminate magnitude,"

---

Congress has unequivocally said otherwise. The ADA could not be clearer that the "remedies, procedures, and rights . . . this subchapter provides" for violations of § 202 are the same as the "remedies, procedures, and rights set forth in" § 505(a)(2) of the Rehabilitation Act, which *is* Spending Clause legislation. 42 U. S. C. § 12133. Section 505(a)(2), in turn, explains that the "remedies, procedures, and rights set forth in title VI . . . shall be available" for violations of § 504 of the Rehabilitation Act. 29 U. S. C. § 794a(a)(2). These explicit provisions make discussion of the ADA's status as a "non Spending Clause" tort statute quite irrelevant.

[4] JUSTICE STEVENS suggests that our decision likewise rests on a theory neither presented nor passed on below. *Post,* at 191–192. But the parties raised, and the courts below passed on, the applicability of *Franklin* v. *Gwinnett County Public Schools,* 503 U. S. 60 (1992), to the question presented. That case addressed Spending Clause legislation (Title IX) and cited the contract-analogy discussion in *Pennhurst* as the basis for its acknowledgment of a notice requirement. See 503 U. S., at 74–75. Respondent did argue (quite correctly) that petitioners had failed to rely on the *Newport* ground that JUSTICE STEVENS uses, *Newport* v. *Fact Concerts, Inc.,* 453 U. S. 247, 262–263 (1981), see Brief for Respondent 41–43, but not that they had failed to rely on the contract analogy initiated in *Pennhurst,* Brief for Respondent 35–41.

*ante,* at 188, untethered to compensable harm, and would thus pose a concern that recipients of federal funding could not reasonably have anticipated. I realize, however, and read the Court's opinion as acknowledging, that the contract-law analogy may fail to give such helpfully clear answers to other questions that may be raised by actions for private recovery under Spending Clause legislation, such as the proper measure of compensatory damages.

JUSTICE STEVENS, with whom JUSTICE GINSBURG and JUSTICE BREYER join, concurring in the judgment.

The judgment of the Court of Appeals might be reversed on any of three different theories: (1) as the Court held in *Newport* v. *Fact Concerts, Inc.,* 453 U. S. 247 (1981), absent clear congressional intent to the contrary, municipalities are not subject to punitive damages; (2) an analysis of the text and legislative history of § 504 of Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act of 1990 (ADA) indicates that Congress did not intend to authorize a punitive damages remedy for violations of either statute;[1] or (3) applying reasoning akin to that used in *Pennhurst State School and Hospital* v. *Halderman,* 451 U. S. 1 (1981), that the remedies for violations of federal statutes enacted pursuant to Congress' spending power should be defined by the common law of contracts, third-party beneficiaries are not allowed to recover punitive damages.

Petitioners did not rely on either the first or the third of those theories in either the District Court or the Court of Appeals. Nevertheless, because it presents the narrowest basis for resolving the case, I am convinced that it is an appropriate exercise of judicial restraint to decide the case

---

[1] This was the theory that was adopted by the Court of Appeals for the Sixth Circuit in *Moreno* v. *Consolidated Rail Corp.,* 99 F. 3d 782, 788–792 (1996). It was also the only theory discussed and rejected by the Court of Appeals below.

on the theory that petitioners are immune from punitive damages under *Newport*. There is, however, no justification for the Court's decision to reach out and decide the case on a broader ground that was not argued below. The Court's reliance on, and extension of, *Pennhurst*—a case that was not even cited in petitioners' briefs in the Court of Appeals—is particularly inappropriate.

In *Pennhurst* we were faced with the question whether the Developmentally Disabled Assistance and Bill of Rights Act, 42 U. S. C. § 6010, had imposed affirmative obligations on participating States. Relying in part on the important distinction between statutory provisions that "simply prohibited certain kinds of state conduct" and those that "impose *affirmative* obligations on the States to fund certain services," 451 U. S., at 16–17, we first held that § 6010 was enacted pursuant to the Spending Clause. We then concluded that the "affirmative obligations" that the Court of Appeals had found in § 6010 could "hardly be considered a 'condition' of the grant of federal funds." *Id.*, at 23. "When Congress does impose affirmative obligations on the States, it usually makes a far more substantial contribution to defray costs. . . . It defies common sense, in short, to suppose that Congress implicitly imposed this massive obligation on participating States." *Id.*, at 24.

The case before us today involves a municipality's breach of a condition that simply prohibits certain discriminatory conduct. The prohibition is set forth in two statutes, one of which, Title II of the ADA, was not enacted pursuant to the Spending Clause. Our opinion in *Pennhurst* says nothing about the remedy that might be appropriate for such a breach. Nor do I believe that the rules of contract law on which the Court relies are necessarily relevant to the tortious conduct described in this record. Moreover, the Court's novel reliance on what has been, at most, a useful analogy to contract law has potentially far-reaching consequences that go well beyond the issues briefed and argued

in this case.[2] In light of the fact that the petitioners—in addition to most defendants sued for violations of Title II of the ADA and §504 of the Rehabilitation Act of 1973—are clearly not subject to punitive damages pursuant to our holding in *Newport,* I see no reason to decide the case on the expansive basis asserted by the Court.

Accordingly, I do not join the Court's opinion, although I do concur in its judgment in this case.

---

[2] Although rejected by the Sixth Circuit, see *Westside Mothers* v. *Haveman,* 289 F. 3d 852 (2002), one District Court applied the *Pennhurst* contract analogy in order to support its conclusion that Spending Clause legislation is not the "supreme law of the land." *Westside Mothers* v. *Haveman,* 133 F. Supp. 2d 549, 561 (ED Mich. 2001). The Court fortunately does cabin the potential reach of today's decision by stating that "[w]e do not imply, for example, that suits under Spending Clause legislation are suits in contract, or that contract-law principles apply to all issues that they raise," *ante,* at 189, n. 2, but whenever the Court reaches out to adopt a broad theory that was not discussed in the early stages of the litigation, and that implicates statutes that are not at issue, its opinion is sure to have unforeseen consequences. When it does so unnecessarily, it tends to assume a legislative, rather than a judicial, role. Reliance on a narrower theory that was not argued below does not create that risk. I am not persuaded that "Chicken-Little," *ante,* at 188, n. 2, is an appropriate characterization of judicial restraint; it is, however, a rhetorical device appropriately used by fearless crusaders.