Justice Souter,
dissenting.
I join Justice Breyer’s dissent and add this word only to say outright what would otherwise be implicit, that I agree with the distinction he draws between this case and Barnes v. Gorman, 536 U. S. 181 (2002). See post, at 318 (citing Barnes, supra, at 191 (Souter, J., concurring)). Beyond that, I emphasize the importance for me of §4 of the Handicapped Children’s Protection Act of 1986,100 Stat. 797, note following 20 U. S. C. § 1415 (1988 ed.), which mandated the study by what is now known as the Government Accountability Office. That section, of equal dignity with the fee-shifting provision enacted by the same statute, makes Justice Breyer’s resort to the related Conference Report the reasonable course.
Justice Breyer, with whom Justice Stevens and Justice Souter join, dissenting.
The Individuals with Disabilities Education Act (IDEA or Act), 20 U. S. C. § 1400 et seq. (2000 ed. and Supp. V), says that a court may “award reasonable attorneys’ fees as part of the costs to the parents” who are prevailing parties. § 1415(i)(3)(B). Unlike the Court, I believe that the word “costs” includes, and authorizes payment of, the costs of experts. The word “costs” does not define its own scope. Neither does the phrase “attorneys’ fees as part of costs.” But Members of Congress did make clear their intent by, among other things, approving a Conference Report that specified that “the term ‘attorneys’ fees as part of the costs’ include[s] reasonable expenses and fees of expert witnesses and the reasonable costs of any test or evaluation which is found to be necessary for the preparation of the parent or *309 guardian’s case in the action or proceeding.” H. R. Conf. Rep. No. 99-687, p. 5 (1986), Appendix A, infra, at 326. No Senator or Representative voiced any opposition to this statement in the discussion preceding the vote on the Conference Report—the last vote on the bill before it was sent to the President. I can find no good reason for this Court to interpret the language of this statute as meaning the precise opposite of what Congress told us it intended.
I
There are two strong reasons for interpreting the statutory phrase to include the award of expert fees. First, that is what Congress said it intended by the phrase. Second, that interpretation furthers the IDEA’S statutorily defined purposes.
A
Congress added the IDEA’S cost-shifting provision when it enacted the Handicapped Children’s Protection Act of 1986 (HCPA), 100 Stat. 796. Senator Lowell Weicker introduced the relevant bill in 1985. 131 Cong. Rec. 1979-1980 (1985). As introduced, it sought to overturn this Court’s determination that the then-current version of the IDEA (and other civil rights statutes) did not authorize courts to award attorney’s fees to prevailing parents in IDEA cases. See Smith v. Robinson, 468 U. S. 992 (1984). The bill provided that “ ‘[i]n any action or proceeding brought under this subsection, the court, in its discretion, may award a reasonable attorney’s fee as part of the costs to a parent or legal representative of a handicapped child or youth who is the prevailing party.’” 131 Cong. Rec. 1980; see S. Rep. No. 99-112, p. 2 (1985).
After hearings and debate, several Senators introduced a new bill in the Senate that would have put a cap on attorney’s fees for legal services lawyers, but at the same time would have explicitly authorized the award of “a reasonable attorney’s fee, reasonable witness fees, and other reasonable *310 expenses of the civil action, in addition to the costs to a parent . . . who is the prevailing party.” Id., at 7 (some emphasis deleted). While no Senator objected to the latter provision, some objected to the cap. See, e. g., id., at 17-18 (additional views of Sens. Kerry, Kennedy, Pell, Dodd, Simon, Metzenbaum, and Matsunaga) (accepting cost-shifting provision, but objecting to cap and other aspects of the bill). A bipartisan group of Senators, led by Senators Hatch and Weicker, proposed an alternative bill that authorized courts to award “ ‘a reasonable attorney’s fee in addition to the costs to a parent’ ” who prevailed. Id., at 15-16 (additional views of Sens. Hatch, Weicker, Stafford, Dole, Pell, Matsunaga, Simon, Kerry, Kennedy, Metzenbaum, Dodd, and Grassley); 131 Cong. Rec. 21389.
Senator Weicker explained that the bill
“will enable courts to compensate parents for whatever reasonable costs they had to incur to fully secure what was guaranteed to them by the [Education of the Handicapped Act], As in other fee shifting statutes, it is our intent that such awards will include, at the discretion of the court, reasonable attorney’s fees, necessary expert witness fees, and other reasonable expenses which were necessary for parents to vindicate their claim to a free appropriate public education for their handicapped child.'” Id., at 21390 (emphasis added).
Not a word of opposition to this statement (or the provision) was voiced on the Senate floor, and S. 415 passed without a recorded vote. Id., at 21393.
The House version of the bill also reflected an intention to authorize recovery of expert costs. Following the House hearings, the Committee on Education and Labor produced a substitute bill that authorized courts to “ ‘award reasonable attorneys’ fees, expenses, and costs’ ” to prevailing parents. H. R. Rep. No. 99-296, pp. 1, 5 (1985) (emphasis added). The House Report stated:
*311 “The phrase ‘expenses and costs’ includes expenses of expert witnesses; the reasonable costs of any study, report, test, or project which is found to be necessary for the preparation of the parents’ or guardian’s due process hearing, state administrative review or civil action; as well as traditional costs and expenses incurred in the course of litigating a case (e. g., depositions and interrogatories).” Id., at 6 (emphasis added).
No one objected to this statement. By the time H. R. 1523 reached the floor, another substitute bill was introduced. 131 Cong. Rec. 31369 (1985). This new bill did not change in any respect the text of the authorization of expenses and costs. It did add a provision, however, that directed the General Accounting Office (GAO)—now known as the Government Accountability Office, see note following 31 U. S. C. § 731 (2000 ed., Supp. IV)—to study and report to Congress on the fiscal impact of the cost-shifting provision. See 131 Cong. Rec. 31369-31370. The newly substituted bill passed the House without a recorded vote. Id., at 31377.
Members of the House and Senate (including all of the primary sponsors of the HCPA) then met in conference to work out certain differences. At the conclusion of those negotiations, they produced a Conference Report, which contained the text of the agreed-upon bill and a “Joint Explanatory Statement of the Committee of Conference.” See H. R. Conf. Rep. No. 99-687, at 5, Appendix A, infra, at 325. The Conference accepted the House bill’s GAO provision with “an amendment expanding the data collection requirements of the GAO study to include information regarding the amount of funds expended by local educational agencies and state educational agencies on civil actions and administrative proceedings.” Id., at 7, Appendix A, infra, at 327-328. And it accepted (with minor changes) the cost-shifting provisions provided in both the Senate and House versions. The conferees explained:
*312 “With slightly different wording, both the Senate bill and the House amendment provide for the awarding of attorneys’ fees in addition to costs.
“The Senate recedes to the House and the House recedes to the Senate with an amendment clarifying that ‘the court, in its discretion, may award reasonable attorneys’ fees as part of the costs . . . ’ This change in wording incorporates the Supreme Courtfs] Marek v. Chesnyi, 473 U. S. 1 (1985),] decision.
“The conferees intend that the term ‘attorneys’ fees as part of the costs’ include reasonable expenses and fees of expert witnesses and the reasonable costs of any test or evaluation which is found to be necessary for the preparation of the parent or guardian’s case in the action or proceeding, as well as traditional costs incurred in the course of litigating a case.” Id., at 5, Appendix A, infra, at 326 (emphasis added; citation omitted).
The Conference Report was returned to the Senate and the House. A motion was put to each to adopt the Conference Report, and both the Senate and the House agreed to the Conference Report by voice votes. See Appendix B, infra, at 329 (Senate); Appendix C, infra, at 330 (House). No objection was raised to the Conference Report’s statement that the cost-shifting provision was intended to authorize expert costs. I concede that “sponsors of the legislation did not mention anything on the floor about expert or consultant fees” at the time the Conference Report was submitted. Ante, at 306, n. 2 (Ginsburg, J., concurring in part and concurring in judgment). But I do not believe that silence is significant in light of the fact that every Senator and three of the five Representatives who spoke on the floor had previously signed his name to the Conference Report—a Report that made Congress’ intent clear on the first page of its explanation. See Appendix A, infra, at 325. And every Senator and Representative who took the floor preceding the votes voiced his strong support for the Conference Report. *313 132 Cong. Rec. 16823-16825 (1986) (Senate); id., at 17607-17612 (House). The upshot is that Members of both Houses of Congress voted to adopt both the statutory text before us and the Conference Report that made clear that the statute’s words include the expert costs here in question.
B
The Act’s basic purpose further supports interpreting the provision’s language to include expert costs. The IDEA guarantees a “free” and “appropriate” public education for “all” children with disabilities. 20 U. S. C. § 1400(d)(1)(A) (2000 ed., Supp. V); see also §1401(9)(A) (defining “free appropriate public education” as one “provided at public expense,” “without charge”); §1401(29) (defining “special education” as “specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability” (emphasis added)).
Parents have every right to become involved in the Act’s efforts to provide that education; indeed, the Act encourages their participation. § 1400(c)(5)(B) (IDEA “ensur[es] that families of [disabled] children have meaningful opportunities to participate in the education of their children at school”). It assures parents that they may question a school district’s decisions about what is “appropriate” for their child. And in doing so, they may secure the help of experts. § 1415(h)(1) (parents have “the right to be accompanied and advised by counsel and by individuals with special knowledge or training with respect to the problems of children with disabilities”); see generally Schaffer v. Weast, 546 U. S. 49, 53-54 (2005) (detailing Act’s procedures); Board of Ed. of Hendrick Hudson Central School Dist., Westchester Cty. v. Rowley, 458 U. S. 176, 205-206 (1982) (emphasizing importance of Act’s procedural guarantees).
The practical significance of the Act’s participatory rights and procedural protections may be seriously diminished if parents are unable to obtain reimbursement for the costs of *314 their experts. In IDEA cases, experts are necessary. See Kuriloff & Goldberg, Is Mediation a Fair Way to Resolve Special Education Disputes? First Empirical Findings, 2 Harv. Negotiation L. Rev. 35, 40 (1997) (detailing findings of study showing high correlation between use of experts and success of parents in challenging school district’s plan); Kuriloff, Is Justice Served by Due Process?: Affecting the Outcome of Special Education Hearings in Pennsylvania, 48 Law & Contemp. Prob. 89, 100-101, 109 (1985) (same); see also Brief for National Disability Rights Network et al. as Amici Curiae 6-15 (collecting sources); cf. Schaffer, supra, at 66-67 (Ginsburg, J., dissenting) (“[T]he vast majority of parents whose children require the benefits and protections provided in the IDEA lack knowledge about the educational resources available to their child and the sophistication to mount an effective case against a district-proposed” individualized education program (IEP) (internal quotation marks and brackets omitted)).
Experts are also expensive. See Brief for Respondents 28, n. 17 (collecting District Court decisions awarding expert costs ranging from $200 to $7,600, and noting three reported cases in which expert awards exceeded $10,000). The costs of experts may not make much of a dent in a school district’s budget, as many of the experts they use in IDEA proceedings are already on the staff. Cf. Oberti v. Board of Ed. Clementon School Dist., 995 F. 2d 1204, 1219 (CA3 1993). But to parents, the award of costs may matter enormously. Without potential reimbursement, parents may well lack the services of experts entirely. See Dept. of Education, M. Wagner et al., The Individual and Household Characteristics of Youth With Disabilities: A Report from the National Longitudinal Transition Study-2 (NLTS2), p. 3-10 (Aug. 2003) (prepared by SRI International), online at http://www. nlts2.org/reports/2003_08/nlts2_report_2003_08_complete.pdf (all Internet materials as visited June 23, 2006, and available in Clerk of Court’s case file) (finding that 25% of disabled *315 children live in poverty and 65% live in households with incomes less than $50,000); see Dept, of Education, M. Wagner, C. Marder, J. Blackorby, & D. Cardoso, The Children We Serve: The Demographic Characteristics of Elementary and Middle School Students with Disabilities and Their Households 28 (Sept. 2002) (prepared by SRI International), online at http://www.seels.net/designdocs/SEELS_Children_We_ Serve_Report.pdf (finding that 36% of disabled children live in households with incomes of $25,000 or less).
In a word, the Act’s statutory right to a “free” and “appropriate” education may mean little to those who must pay hundreds of dollars to obtain it. That is why this Court has previously avoided interpretations that would bring about this kind of result. See School Comm. of Burlington v. Department of Ed. of Mass., 471 U. S. 359 (1985) (construing IDEA provision granting equitable authority to courts to include the power to order reimbursement for parents who switch their child to private schools if that decision later proves correct); id., at 370 (without cost reimbursement for prevailing parents, “the child’s right to a free appropriate public education, the parents’ right to participate fully in developing a proper IEP, and all of the procedural safeguards would be less than complete”); Florence County School Dist. Four v. Carter, 510 U. S. 7, 13 (1993) (holding that prevailing parents are not barred from reimbursement for switching their child to a private school that does not meet the IDEA’S definition of a free and appropriate education). In Carter, we explained: “IDEA was intended to ensure that children with disabilities receive an education that is both appropriate and free. To read the provisions of § 1401(a)(18) to bar reimbursement in the circumstances of this case would defeat this statutory purpose.” Id., at 13-14 (citation omitted).
To read the word “costs” as requiring successful parents to bear their own expenses for experts suffers from the same problem. Today’s result will leave many parents and guardians “without an expert with the firepower to match the op *316 position,” Schaffer, 546 U. S., at 61, a far cry from the level playing field that Congress envisioned.
II
The majority makes essentially three arguments against this interpretation. It says that the statute’s purpose and “legislative history is simply not enough” to overcome: (1) the fact that this is a Spending Clause case; (2) the text of the statute; and (3) our prior cases which hold that the term “costs” does not include expert costs. Ante, at 304. I do not find these arguments convincing.
A
At the outset the majority says that it “is guided by the fact that Congress enacted the IDEA pursuant to the Spending Clause.” Ante, at 295. “In a Spending Clause case,” the majority adds, “the key is not what a majority of the Members of both Houses intend but what the States are clearly told regarding the conditions that go along with the acceptance of those funds.” Ante, at 304. Thus, the statute’s “conditions must be set out ‘unambiguously.’” Ante, at 296 (citing Pennhurst State School and Hospital v. Halderman, 451 U. S. 1, 17 (1981), and Rowley, 458 U. S., at 204, n. 26). And “we must ask” whether the statute “furnishes clear notice regarding the liability at issue in this case.” Ante, at 296.
I agree that the statute on its face does not clearly tell the States that they must pay expert fees to prevailing parents. But I do not agree that the majority has posed the right question. For one thing, we have repeatedly examined the nature and extent of the financial burdens that the IDEA imposes without reference to the Spending Clause or any “clear-statement rule.” See, e. g., Burlington, supra, at 369 (private school fees); Carter, supra, at 13 (same); Smith, 468 U. S., at 1010-1011 (attorney’s fees); Cedar Rapids Community School Dist. v. Garret F., 526 U. S. 66, 76-79 (1999) (continuous nursing service); but see id., at 83 (Thomas, J., *317 joined by Kennedy, J., dissenting). Those cases did not ask whether the statute “furnishes clear notice” to the affirmative obligation or liability at issue.
For another thing, neither Pennhurst nor any other case suggests that every spending detail of a Spending Clause statute must be spelled out with unusual clarity. To the contrary, we have held that Pennhurst’s requirement that Congress “unambiguously” set out “a condition on the grant of federal money” does not necessarily apply to legislation setting forth “the remedies available against a noncomplying State.” Bell v. New Jersey, 461 U. S. 773, 790, n. 17 (1983) (emphasis added) (rejecting Pennhurst-based argument that Elementary and Secondary Education Act of 1965 did not unambiguously provide that the Secretary could recover federal funds that are misused by a State). We have added that Pennhurst does not require Congress “specifically” to “identify” and “proscribe each condition in [Spending Clause] legislation.” Jackson v. Birmingham Bd. of Ed., 544 U. S. 167, 183 (2005) (emphasis added; internal quotation marks and brackets omitted) (rejecting argument that Pennhurst precluded interpreting Title IX’s private cause of action to encompass retaliation); see also Bennett v. Kentucky Dept. of Ed., 470 U. S. 656, 665-666 (1985). And we have denied any implication that “suits under Spending Clause legislation are suits in contract, or that contract-law principles apply to all issues that they raise.” Barnes v. Gorman, 536 U. S. 181, 188-189, n. 2 (2002) (emphasis added).
These statements and holdings are not surprising. After all, the basic objective of Pennhurst’s clear-statement requirement does not demand textual clarity in respect to every detail. That is because ambiguity about the precise nature of a statutory program’s details—particularly where they are of a kind that States might have anticipated—is rarely relevant to the basic question: Would the States have accepted the Federal Government’s funds had they only known the nature of the accompanying conditions? Often, *318 the later filling-in of details through judicial interpretation will not lead one to wonder whether funding recipients would have agreed to enter the basic program at all. Given the nature of such details, it is clear that the States would have entered the program regardless. At the same time, to view each statutory detail of a highly complex federal/state program (involving, say, transportation, schools, the environment) simply through the lens of linguistic clarity, rather than to assess its meanings in terms of basic legislative purpose, is to risk a set of judicial interpretations that can prevent the program, overall, from achieving its basic objectives or that might well reduce a program in its details to incoherence.
This case is about just such a detail. Permitting parents to recover expert fees will not lead to awards of “indeterminate magnitude, untethered to compensable harm” and consequently will not “pose a concern that recipients of federal funding could not reasonably have anticipated.” Barnes, 536 U. S., at 190-191 (SOUTER, J., joined by O’Connor, J., concurring) (citation and internal quotation marks omitted). Unlike, say, punitive damages, an award of costs to expert parties is neither “unorthodox” nor “indeterminate,” and thus does not throw into doubt whether the States would have entered into the program. Id., at 188. If determinations as to whether the IDEA requires States to provide continuing nursing services, Cedar Rapids, supra, or reimbursement for private school tuition, Burlington, 471 U. S. 359, do not call for linguistic clarity, then the precise content of recoverable “costs” does not call for such clarity here a fortiori.
B
If the Court believes that the statute’s language is unambiguous, I must disagree. The provision at issue says that a court “may award reasonable attorneys’ fees as part of the costs” to parents who prevail in an action brought under the Act. 20 U. S. C. § 1415(i)(3)(B). The statute neither defines *319 the word “costs” nor points to any other source of law for a definition. And the word “costs,” alone, says nothing at all about which costs fall within its scope.
Neither does the statutory phrase—“as part of the costs to the parents of a child with a disability who is the prevailing party”—taken in its entirety unambiguously foreclose an award of expert fees. I agree that, read literally, that provision does not clearly grant authority to award any costs at all. And one might read'it, as the Court does, as referencing another federal statute, 28 U. S. C. § 1920, which provides that authority. See ante, at 297-298; see also § 1920 (federal taxation of cost statute). But such a reading is not inevitable. The provision (indeed, the entire Act) says nothing about that other statute. And one can, consistent with the language, read the provision as both embodying a general authority to award costs while also specifying the inclusion of “reasonable attorneys’ fees” as part of those costs (as saying, for example, that a court “may award reasonable attorneys’ fees as part of [a] costs [award]”).
This latter reading, while linguistically the less natural, is legislatively the more likely. The majority’s alternative reading, by cross-referencing only the federal general cost-awarding statute (which applies solely in federal courts), would produce a jumble of different cost definitions applicable to similar IDEA administrative and state-court proceedings in different States. See § 1920 (“A judge or clerk of any court of the United States may tax as costs the following ...” (emphasis added)). This result is particularly odd, as all IDEA actions must begin in state due process hearings, where the federal cost statute clearly does not apply, and the overwhelming majority of these actions are never appealed to any court. See GAO, Report to the Ranking Minority Member, Committee on Health, Education, Labor and Pensions, U. S. Senate, Special Education: Numbers of Formal Disputes Are Generally Low and States Are Using Mediation and Other Strategies to Resolve Conflicts (GAO- *320 03-897), p. 13 (Sept. 2003), online at http://www.gao.gov/new. items/d03897.pdf (approximately 3,000 administrative hearings annually; under 10% appealed to state or federal court); see also Moore v. District of Columbia, 907 F. 2d 165, 166 (CADC 1990) (en banc) (joining other Circuits in holding that IDEA authorizes an “award of attorney fees to a parent who prevails in [IDEA] administrative proceedings”). And when parents do appeal, they can file their actions in either state or federal courts. 20 U. S. C. § 1415(i)(2)(A) (2000 ed., Supp. V).
Would Congress “obviously” have wanted the content of the word “costs” to vary from State to State, proceeding to proceeding? Ante, at 297-298. Why? At most, the majority’s reading of the text is plausible; it is not the only possible reading.
C
The majority’s most persuasive argument does not focus on either the Spending Clause or lack of statutory ambiguity. Rather, the majority says that “costs” is a term of art. In light of the law’s long practice of excluding expert fees from the scope of the word “costs,” along with this Court’s cases interpreting the word similarly in other statutes, the “legislative history is simply not enough.” Ante, at 304.
I am perfectly willing to assume that the majority is correct about the traditional scope of the word “costs.” In two cases this Court has held that the word “costs” is limited to the list set forth in 28 U. S. C. § 1920 and does not include fees paid to experts. See Crawford Fitting Co. v. J. T. Gibbons, Inc., 482 U. S. 437 (1987) (interpreting Fed. Rule Civ. Proc. 54(d)); West Virginia Univ. Hospitals, Inc. v. Casey, 499 U. S. 83 (1991) (interpreting 42 U. S. C. § 1988 (1988 ed.)). But Congress is free to redefine terms of art. See, e. g., Casey, 499 U. S., at 88-90 (citing examples of statutes that shift “‘costs of litigation (including . . . expert witness fees)’”). And we have suggested that it might well do so through a statutory provision worded in a manner similar to *321 the statute here—indeed, we cited the Conference Report language here at issue. Id., at 91-92, n. 5 (characterizing language as an “apparent effort to depart from ordinary meaning and to define a term of art” and noting that Congress made no such “effort” in respect to 42 U. S. C. § 1988).
Regardless, here the statute itself indicates that Congress did not intend to use the word “costs” as a term of art. The HCPA, which added the cost-shifting provision (in § 2) to the IDEA, also added another provision (in §4) directing the GAO to “conduct a study of the impact of the amendments to the [IDEA] made by section 2” over a 3V6-year period following the Act’s effective date. § 4(a), 100 Stat. 797. To determine the fiscal impact of §2 (the cost-shifting provision), §4 ordered the GAO to submit a report to Congress containing, among other things, the following information:
“Data, for a geographically representative select sample of States, indicating (A) the specific amount of attorneys’fees, costs, and expenses awarded to the prevailing party, in each action and proceeding under [§ 2] from the date of the enactment of this Act through fiscal year 1988, and the range of such fees, costs and expenses awarded in the actions and proceedings under such section, categorized by type of complaint and (B) for the same sample as in (A) the number of hours spent by personnel, including attorneys and consultants, involved in the action or proceeding, and expenses incurred by the parents and the State educational agency and local educational agency.” § 4(b)(3), id., at 797-798 (emphasis added).
If Congress intended the word “costs” in § 2 to authorize an award of only those costs listed in the federal cost statute, why did it use the word “expenses” in § 4(b)(3)(A) as part of the “amount . . . awarded to the prevailing party”? When used as a term of art, after all, “costs” does not cover expenses. Nor does the federal costs statute cover any ex *322 penses—at least not any that Congress could have wanted the GAO to study. Cf. 28 U. S. C. § 1920 (referring only once to “expenses,” and doing so solely to refer to special interpretation services provided in actions initiated by the United States).
Further, why did Congress, when asking the GAO (in the statute itself) to study the “number of hours spent by personnel,” include among those personnel both attorneys “and consultants”? Who but experts could those consultants be? Why would Congress want the GAO to study the hours that those experts “spent,” unless it thought that it would help keep track of the “costs” that the statute imposed?
Of course, one might, through speculation, find other answers to these questions. One might, for example, imagine that Congress wanted the GAO to study the expenses that payment of expert fees engendered in state-court proceedings where state, but not federal, law requires that “‘expenses’ other than ‘costs’ might be receivable.” Ante, at 299, n. 1; but see supra, at 319-320. Or one might think that the word “expenses” is surplusage. Ante, at 299, n. 1; but see Duncan v. Walker, 533 U. S. 167, 174 (2001) (expressing Court’s “‘reluctante] to treat statutory terms as surplusage’ in any setting,” but especially when they play “so pivotal a place in the statutory scheme”). Or one might believe that Congress was interested in the hours these experts spent, but not in the fees they obtained. Ante, at 299. But these answers are not necessarily consistent with the purpose of the GAO study provision, a purpose revealed by the language of the provision and its position in the statute. Its placement and its reference to § 2 indicate that Congress ordered the study to help it keep track of the magnitude of the reimbursements that an earlier part of the new statute (namely, § 2) mandated. See 100 Stat. 797 (stating that purpose of GAO study was to determine the “impact” of “section 2”). And the only reimbursement requirement that §2 mandates is the payment of “costs.”
*323 But why speculate about this? We know what Congress intended the GAO study to cover. It told the GAO in its Conference Report that the word “costs” included the costs of experts. And, not surprisingly, the GAO made clear that it understood precisely what Congress asked it to do. In its final report, the GAO wrote: “Parents can receive reimbursement from state or local education agencies for some or all of their attorney fees and related expenses if they are the prevailing party in part or all of administrative hearings or court proceedings. Expert witness fees, cost of tests or evaluations found to be necessary during the case, and court costs for services rendered during administrative and court proceedings are examples of reimbursable expenses.” GAO, Briefing Report to Congressional Requesters, Special Education: The Attorney Fees Provision of Public Law 99-372 (GAO/HRD-90-22BR), p. 13 (Nov. 1989) (emphasis added), online at http://archive.gao.gov/d26t7/140084.pdf. At the very least, this amounts to some indication that Congress intended the word “costs,” not as a term of art, not as it was used in the statutes at issue in Casey and Crawford Fitting, but rather as including certain additional “expenses.” If that is so, the claims of tradition, of the interpretation this Court has given other statutes, cannot be so strong as to prevent us from examining the legislative history. And that history could not be more clear about the matter: Congress intended the statutory phrase “attorneys’ fees as part of the costs” to include the costs of experts. See Part I, supra.
Ill
For the reasons I have set forth, I cannot agree with the majority’s conclusion. Even less can I agree with its failure to consider fully the statute’s legislative history. That history makes Congress’ purpose clear. And our ultimate judicial goal is to interpret language in light of the statute’s purpose. Only by seeking that purpose can we avoid the substitution of judicial for legislative will. Only by reading *324 language in its light can we maintain the democratic link between voters, legislators, statutes, and ultimate implementation, upon which the legitimacy of our constitutional system rests.
In my view, to keep faith with that interpretive goal, we must retain all traditional interpretive tools—text, structure, history, and purpose. And, because faithful interpretation is art as well as science, we cannot, through rule or canon, rule out the use of any of these tools, automatically and in advance. Cf. Helvering v. Gregory, 69 F. 2d 809, 810-811 (CA2 1934) (L. Hand, J.).
Nothing in the Constitution forbids us to give significant weight to legislative history. By disregarding a clear statement in a legislative Report adopted without opposition in both Houses of Congress, the majority has reached a result no Member of Congress expected or overtly desired. It has adopted an interpretation that undercuts, rather than furthers, the statute’s purpose, a “free” and “appropriate” public education for “all” children with disabilities. See Circuit City Stores, Inc. v. Adams, 532 U. S. 105, 133 (2001) (Stevens, J., joined by Souter, Ginsburg, and Breyer, JJ., dissenting) (“A method of statutory interpretation that is deliberately uninformed, and hence unconstrained, may produce a result that is consistent with a court’s own views of how things should be, but it may also defeat the very purpose for which a provision was enacted”). And it has adopted an approach that, I fear, divorces law from life. See Duncan, supra, at 193 (Breyer, J., joined by Ginsburg, J., dissenting).
For these reasons, I respectfully dissent.
*325 APPENDIXES TO OPINION OF BREYER, J.
A
[[Image here]]
July 16, 1986.—Ordered to be printed
Mr. Hawkins, from the committee of conference, submitted the following
CONFERENCE REPORT
[To accompany S. 415]
The committee of conference on the disagreeing votes of the two Houses on the amendments of the House to the bill (S. 415), to amend the Education of the Handicapped Act to authorize the award of reasonable attorneys’ fees to certain prevailing parties, and to clarify the effect of the Education of the Handicapped Act on rights, procedures, and remedies under other laws relating to the prohibition of discrimination, having met, after full and free conference, have agreed to recommend and do recommend to their respective Houses as follows:
That the Senate recede from its disagreement to the amendment of the House to the text of the bill and agree to the same with an amendment as follows:
In lieu of the matter proposed to be inserted by the House amendment, insert the following:

[Text of Act omitted.]

JOINT EXPLANATORY STATEMENT OF THE COMMITTEE OF CONFERENCE
The managers on the part of the House and the Senate at the conference on the disagreeing votes of the two Houses on the amendment of the House to the bill (S. 415) to authorize the award of attorneys’ fees to certain prevailing parties, and to clarify the effect of the Education of the Handicapped Act on rights, proce *326 dures, and remedies under other laws relating to the prohibition of discrimination, and for other purposes, submit the following joint statement to the House and the Senate in explanation of the effect of the action agreed upon by the managers and recommended in the accompanying conference report. The differences between the Senate bill and the House amendment and the substitute agreed to in the conference, are noted below, except for clerical corrections, conforming changes made necessary by agreements reached by the conferees, and minor drafting and clarifying changes.
1. The Senate bill provides for “a reasonable attorney’s fee.”
The House amendment provides for “reasonable attorneys’ fees.”
The Senate recedes.
2. With slightly different wording, both the Senate bill and the House amendment provide for the awarding of attorneys’ fees in addition to costs.
The Senate recedes to the House and the House recedes to the Senate with an amendment clarifying that “the court, in its discretion, may award reasonable attorneys’ fees as part of the costs . . .” This change in wording incorporates the Supreme Court Marek v. Chesny decision (87 L. Ed. 2d 1).
The conferees intend that the term “attorneys’ fees as part of the costs” include reasonable expenses and fees of expert witnesses and the reasonable costs of any test or evaluation which is found to be necessary for the preparation of the parent or guardian’s case in the action or proceeding, as well as traditional costs incurred in the course of litigating a case.
3. The Senate bill provides for the .award of attorney’s fees “to a parent or legal representative.”
The House amendment provides for the award of attorneys’ fees “to the parents or guardian.”
The Senate recedes.
4. The Senate bill limits the amount of the fee awarded whenever a parent or legal representative is represented by a publicly funded organization which provides legal services.
The House amendment provides that fee awards shall be based on prevailing rates in the community.
The House recedes to the Senate and the Senate recedes to the House with an amendment clarifying that “fees awarded under this subsection shall be based on rates prevailing in the community in which the action or proceeding arose for the kind and quality of services furnished.” See, Hensley v. Eckerhart, 461 U.S. 424 (1983); Marek v. Chesny, 87 L. Ed 2d 1 (1985); and Blum v. Stenson, 104 S. Ct. 1541 (1984). However, no such awards of attorneys’ fees shall be calculated by using bonuses or multipliers. The conferees want to make it clear that the inclusion of the prohibition against calculation of fees using bonuses and multipliers is limited to cases brought only under part B of the Education of the Handicapped Act. The conferees do not intend in any way to diminish the applicability of interpretation by the U.S. Supreme Court regarding bonuses and multipliers to other statutes such as 42 U.S.C. 1988. See, Hensley v. Eckerhart, Blum v. Stenson, Evans v. Jeff D., 106 S. Ct. 1531 (1986). In addition, several new sections would be added to clarify that under part B of the Education of the Handicapped Act, *327 no award of attorneys’ fees and related costs subject to the provision of the act may be made for services performed subsequent to the time a written offer of settlement is made to a party (if the offer is made at least 10 days prior to the date of the action or proceeding) if the offer is not accepted within ten days and a court or administrative officer finds that the relief finally obtained by the party is not more favorable to the parent or guardian than the offer of settlement. However, attorneys’ fees may be awarded to a prevailing parent or guardian who was substantially justified in rejecting the settlement offer. Furthermore, the court shall reduce accordingly the amount of attorneys’ fees and related expenses otherwise allowable if they determine that:
(1) the parent or guardian, during the course of the action or proceeding unreasonably protracted the final resolution of the controversy;
(2) the amount of attorneys’ fees otherwise authorized to be awarded unreasonably exceeds the hourly rate prevailing in the community for similar services by attorneys of reasonably comparable-skills experience and reputation; or
(3) the time spent and legal services furnished were excessive considering the nature of the action or proceeding.
Finally, the preceding situations in which the court reduces the amount of fees and related expenses otherwise allowable shall not apply if the local or state educational agency is determined to have unreasonably protracted the final resolution of the action or proceeding or if a violation of section 615 of the Education of the Handicapped Act is found.
The conferees intend that this provision clarify the application of the Marek v. Chesny decision to the Handicapped Children’s Protection Act. One exception is made to the applicability of the Marek v. Chesny decision. When the parent or guardian is substantially justified in rejecting the settlement offer, the Marek v. Chesny decision would not apply. Substantial justification for rejection would include relevant pending court decisions which could have an impact on the case in question.
In enumerating three conditions under which the amount of attorneys’ fees would be reduced, the committee intends to protect against excessive reimbursement. The second condition is a codification of the policy for awarding fees in footnote 11 of Blum v. Stenson.
5. The House amendment, but not the Senate bill, specifies that fees, expenses, and costs awarded to the prevailing party may not be paid with the funds provided under part B of EHA. The report accompanying the Senate’s bill restates existing policy that bars the payment of such fees and the costs under part B.
The House recedes. The conferees wish to emphasize that existing law bars payment of attorneys’ fees with funds appropriated under B of EHA.
6. The House amendment, but not the Senate bill, provides for a GAO study of the impact of the bill authorizing the awarding of fees and costs. The Senate recedes to the House with an amendment expanding the data collection requirements of the GAO study to include infor *328 mation regarding the amount of funds expended by local educational agencies and state educational agencies on civil actions and administrative proceedings.
7. The House amendment, but not the Senate bill, sunsets the court’s authority to award fees at the administrative level after a period of time specified in the legislation. The House recedes.
8. With slightly different wording, both the Senate bill and the House amendment authorize the filing of civil actions under legal authorities other than part B of EHA so long as parents first exhaust administrative remedies available under part B of EHA to the same extent as would be required under that part.
The House recedes. It is the conferees’ intent that actions brought under 42 U.S.C. 1983 are governed by this provision.
9. The House amendment, but not the Senate bill, requires public access to hearing decisions.
The House recedes. The conferees wish to emphasize that public access to hearing decisions is existing law.
10. The House amendment, but not the Senate bill, requires that the public educational agency provide parents with an opportunity to meet informally in an attempt to resolve a complaint.
The House recedes.
11. The House amendment, but not the Senate bill, includes an anti-retaliation provision.
The House recedes. It is the conferees’ intent that no person may discharge, intimidate, retaliate, threaten, coerce, or otherwise take an adverse action against any person because such person has filed a complaint, testified, furnished information, assisted or participated in any manner in a meeting, hearing, review, investigation, or other activity related to the administration of, exercise of authority under, or right secured by part B of EHA. The term “person” the first time it is used means a state educational agency, local educational agency, intermediate educational unit or any official or employee thereof.
12. The House amendment, but not the Senate bill, makes retroactive its provision regarding the effect of EHA on other laws (section 3).
The House recedes.
Augustus F. Hawkins,
Mario Biaggi,
Pat Williams,
Charles A. Hayes,
Matthew G. Martinez,
Dennis E. Eckart,

Managers on the Part of the House.

Orrin Hatch,
Lowell P. Weicker, Jr.,
Don Nickles,
Ted Kennedy,
John F. Kerry,

Managers on the Part of the Senate.

*329 B
Excerpts from Congressional Record
132 Cong. Rec. 16823-16825 (1986) (Senate)
HANDICAPPED CHILDREN’S PROTECTION ACT-CONFERENCE REPORT
Mr. WEICKER. Mr. President, I submit a report of the committee of conference on S. 415 and ask for its immediate consideration.
The PRESIDING OFFICER. The report will be stated.
The legislative clerk read as follows:
The committee of conference on the disagreeing votes of the two Houses on the amendments of the House to the bill (S. 415) to amend the Education of the Handicapped Act to authorize the award of reasonable attorneys’ fees to certain prevailing parties, and to clarify the effect of the Education of the Handicapped Act on rights, procedures, and remedies under other laws relating to the prohibition on discrimination, having met, after full and free conference, have agreed to recommend and do recommend to their respective Houses this report, signed by a majority of the conferees.
The PRESIDING OFFICER. Without objection, the Senate will proceed to the consideration of the conference report.

[Floor statements omitted.]

Mr. WEICKER. Mr. President, I move adoption of the conference report.
The PRESIDING OFFICER. The question is on agreeing to the conference report.
The conference report was agreed to.
Mr. WEICKER. Mr. President, I move to reconsider the vote by which the conference report was agreed to.
*330 c
Excerpts from Congressional Record
132 Cong. Rec. 17607-17612 (House)
CONFERENCE REPORT ON S.415, HANDICAPPED CHILDREN’S PROTECTION ACT OF 1986
Mr. WILLIAMS. Mr. Speaker, I call up the conference report on the Senate bill (S. 415) to amend the Education of the Handicapped Act to authorize the award of reasonable attorneys’ fees to certain prevailing parties, and to clarify the effect of the Education of the Handicapped Act on rights, procedures, and remedies under other laws relating to the prohibition of discrimination.
The Clerk read the title of the Senate bill.

[Floor statements omitted.]

Mr. WILLIAMS. Mr. Speaker, I yield back the balance of my time, and I move the previous question on the conference report.
The previous question was ordered.
The conference report was agreed to.